# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

**21-105 consolidated with**
**21-612**

**STATE OF LOUISIANA**

**VERSUS**

**DEONTAY DESHUN HARDY**

\*\*\*\*\*\*\*\*\*\*

ON APPEAL FROM THE
TENTH JUDICIAL DISTRICT COURT
PARISH OF NATCHITOCHES, NO. C-23998
HONORABLE LALA B. SYLVESTER, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

**JONATHAN W. PERRY**
**JUDGE**

\*\*\*\*\*\*\*\*\*\*

Court composed of Sylvia R. Cooks, Chief Judge, Jonathan W. Perry and Sharon Darville Wilson, Judges.

CONVICTIONS AFFIRMED.
SENTENCES VACATED.
REMANDED TO THE TRIAL COURT
FOR RESENTENCING AND CORRECTION
OF THE COURT MINUTES.

Paula C. Marx
Louisiana Appellate Project
P. O. Box 82389
Lafayette, LA 70598-2389
(337) 991-9757
**COUNSEL FOR DEFENDANT/APPELLANT**:
    Deontay Deshun Hardy

Deontay Deshun Hardy
Pro Se
Doc Number 702823
Louisiana State Penitentiary
17544 Tunica Trace
Angola, LA 70712-3029
**DEFENDANT/APPELLANT**

Hon. Billy Joe Harrington
District Attorney
Tenth Judicial District
J. Chris Guillet
Assistant District Attorney
P.O. Box 838
Natchitoches, Louisiana 71458-0838
**COUNSEL FOR APPELLEE**:
    State of Louisiana.

**PERRY, Judge.**

In this criminal case, Deontay Deshun Hardy ("Defendant") appeals his convictions and sentences for armed robbery and attempted armed robbery. For the following reasons, we affirm Defendant's convictions, vacate the sentences imposed, and remand for resentencing due to the trial court's improper imposition of firearm enhancements on both convictions.

### FACTS AND PROCEDURAL HISTORY

The facts will be elaborated upon later in our discussion of whether the State proved Defendant's guilt with sufficient evidence. Nonetheless, we will provide a thumbnail sketch of those facts at this juncture.

On May 1, 2016, two armed men, wearing blue surgical gloves, robbed Paul Smith, Sr. ("Mr. Smith"), in the parking lot of the Southern Classic Chicken ("Southern Classic")[1] in Natchitoches just after the restaurant closed for the day at approximately 10:40 p.m.; the robbers took Mr. Smith's keys and cellphone. Afterwards, as captured on a videotape from the restaurant, the two men entered Southern Classic through the back door, held the employees at gunpoint, and demanded that the manager, Shylonda Smith ("Mrs. Smith"), open the safe. When Mrs. Smith was unable to open the safe, gunshots were fired through the glass door at the front of the restaurant, the two armed intruders exited the restaurant, ran around a wooden fence adjacent to the restaurant parking lot, and then fled into the neighborhood.

Corporal Marshall Guin ("Corporal Guin") of the Natchitoches Police Department, who had already responded to the incident, saw the two individuals run from the restaurant. He chased them and recorded his pursuit on a body camera.

---

[1] Although the record shows the restaurant is referred to by multiple variations of its name throughout the trial, all the references are to the same restaurant, Southern Classic Chicken.

After a chase of a few minutes, the officer captured Defendant who was wearing the same clothes recorded on the video in Southern Classic. Corporal Guin then arrested Defendant[2] and transported him to the police station where he signed a waiver of rights form before being transported to the local hospital.

On May 19, 2016, prior to the filing of the bill of information by the State, Defendant filed a motion for "Preliminary Exam and Bond Reduction." Shortly thereafter, on June 21, 2016, Defendant was charged by bill of information with one count of armed robbery, a violation of La.R.S. 14:64. The victim was listed as "Southern Classic." On July 12, 2016, Defendant, with appointed counsel, appeared via video conference, waived arraignment, and entered a plea of not guilty to the charge.

On July 25, 2016, Defendant filed a pro se motion which alleged that he had a mental disability based upon his receipt of supplemental support income from the federal government. As a result, on July 26, 2016, the trial court appointed a sanity commission to determine Defendant's ability to proceed to trial and stayed prosecution pending the determination of the sanity commission. An "Amended Order" was issued on August 5, 2016, expanding the sanity commission to three people, namely Drs. Marc Colon, Patrick Wheat, and Daniel Lonowski. Drs. Wheat and Lonowski were then replaced with Drs. Darrel Turner and Jessica Boudreaux on October 11, 2016. On May 4, 2017, the commission was again altered when Dr. Colon was replaced by Dr. Michael Todd Lobrano. On August 28, 2017, after the sanity commission submitted its reports, Defendant, with counsel present, stipulated that he had the capacity to proceed to trial "without the necessity of hearing." Based

---

[2] Defendant was also subject to a probation hold. As reflected in the court minutes of May 5, 2016, Defendant had been convicted of attempted armed robbery sometime in 2015, and he was on probation at the time of this subsequent arrest in 2016.

2

upon the doctors' reports and the stipulation, the trial court found Defendant was competent to stand trial. At that time, the trial court lifted the stay of prosecution and ordered that Defendant's trial should move forward.

On January 24, 2018, the Public Defender's Office appointed a new attorney to represent Defendant. After continuances on June 25, 2018, July 31, 2018, September 27, 2018, and November 19, 2018, the trial court held a preliminary examination on February 25, 2019. The preliminary exam was recessed after testimony from Corporal Guin, the officer who apprehended Defendant following the robbery of Southern Classic. The recess was necessitated because the lead investigator from the Natchitoches Police Department, Lieutenant Victor Pinkney ("Lieutenant Pinkney"), was unavailable. On March 19, 2019, the court resumed the preliminary examination with testimony from Lieutenant Pinkney. Following Lieutenant Pinkney's testimony, the trial court found probable cause to continue the prosecution of the matter.

On October 17, 2019, Defendant filed a pro se "Motion for Suppression of Statements, Evidence and Identifications." Subsequently, on January 28, 2020, the trial court held a hearing on Defendant's motion to suppress. The hearing ultimately did not occur as Defendant contended that he wished to represent himself; accordingly, the trial court instructed Defendant to file a motion to represent himself and to refile his motion to suppress with more specificity. Defendant neither filed a motion to represent himself nor refiled his motion to suppress.

However, on July 7, 2020, the trial court held a hearing on the State's motion to introduce Defendant's statements made to law enforcement and simultaneously considered Defendant's motion to suppress said statements. Ultimately, the trial court took the matter under consideration. On July 23, 2020, the trial court issued a

3

written ruling, finding Defendant's statement to Lieutenant Pinkney at the Natchitoches Regional Medical Center was admissible at trial.

On September 2, 2020, Defendant filed a pro se "Motion for Speedy Trial," which the trial court denied because Defendant's trial had a priority fixing for October 12, 2020. Subsequently, on September 29, 2020, defense counsel filed a written "Motion for Continuance with Incorporated Memorandum and Defense Objections to Proceeding to Jury Trial During Covid-19 Public Health Emergency." On October 6, 2020, the trial court denied defense counsel's motion, noting the court had procedures in place to allow for trial while minimizing health risks and commenting on defense counsel's failure to address why those procedures would be insufficient.

On October 8, 2020, the State amended its bill of information to charge Defendant with two counts of armed robbery. The victim in Count One was listed as "Southern Classic Restaurant and Shylonda Smith," and the victim in Count Two was listed as "Paul Smith Sr." On October 12, 2020, Defendant waived the formal reading of the bill of information and entered a plea of not guilty to the amended charges.

Afterwards, voir dire for Defendant's trial began on October 12, 2020. Trial commenced on October 13, 2020, and on October 14, 2020, the jury returned unanimous verdicts finding Defendant guilty of attempted armed robbery of Southern Classic and Mrs. Smith, and guilty of armed robbery of Mr. Smith. On January 26, 2021, Defendant was sentenced to serve ninety years at hard labor without benefit of parole, probation, or suspension of sentence for armed robbery and forty years at hard labor without benefits for attempted armed robbery.[3]

_____

[3] The trial judge did not specifically state that Defendant's sentence for attempted armed

4

Additionally, the trial court invoked the firearm enhancement statute, La.R.S. 14:64.3, and ordered Defendant to serve an additional five years at hard labor without benefit of parole, probation, or suspension of sentence for each conviction. All sentences were ordered to run consecutive to each other for a total sentence of one-hundred forty years at hard labor.

On October 29, 2020, Defendant filed two pro se motions, a "Motion for New Trial" and a "Motion for Post Verdict Judgment of Acquittal." Both motions were denied by the trial court on November 2, 2020. Defense counsel then filed a boilerplate "Motion to Reconsider the Court's Sentence" on January 26, 2021, which requested reconsideration "on the basis that the sentence imposed upon [Defendant] is excessive." The motion was denied the following day without a hearing.

On January 19, 2021, Defendant filed a pro se application for supervisory writs with this court, seeking review of the trial court's denial of his motion to suppress evidence. The application was accepted under docket number 21-105 but was subsequently consolidated with Defendant's counsel-filed appeal under the present docket number. Accordingly, we will address the issues raised in docket number 21-105 as pro se assignments of appellate error in this opinion and render a separate writ ruling under that docket number.

---

robbery was to be served without benefits. However, La.R.S. 15:301.1(A) states:

> When a criminal statute requires that all or a portion of a sentence imposed for a violation of that statute be served without benefit of probation, parole, or suspension of sentence, each sentence which is imposed under the provisions of that statute shall be deemed to contain the provisions relating to the service of that sentence without benefit of probation, parole, or suspension of sentence. The failure of a sentencing court to specifically state that all or a portion of the sentence is to be served without benefit of probation, parole, or suspension of sentence shall not in any way affect the statutory requirement that all or a portion of the sentence be served without benefit of probation, parole, or suspension of sentence.

Appellate counsel[4] raised five assignments of error: (1) there is insufficient evidence to support Defendant's convictions, (2) the trial court erred in denying Defendant's motion for a continuance due to the COVID-19 Pandemic, (3) the trial court imposed excessive sentences, (4) the trial court erred in imposing consecutive sentences without justification, and (5) the trial court erred by applying the firearm sentencing enhancement to Defendant's sentences.

Additionally, Defendant raises six pro se assignments of error, contending the trial court: (1) erred in not reviewing Officer Guin's body camera footage in its entirety; (2) erred in finding probable cause for arrest; (3) abused its discretion in admitting evidence obtained by Officer Guin; (4) erred in finding Defendant's alleged statement to Lieutenant Pinkney was admissible, (5) erred in not suppressing evidence obtained in violation of Defendant's rights, and (6) erred in finding that there was sufficient evidence to support Defendant's convictions.[5]

## ERRORS PATENT REVIEW

As required by La.Code Crim.P. art. 920, this court reviews all appeals for errors patent on the face of the record. After thoroughly reviewing the record, we find two errors patent—one involving the court minutes which incorrectly memorialized the jury's verdict and one involving the trial court's invocation of the firearm sentencing enhancement to Defendant's sentences. Because the sentencing enhancement was also assigned as error, we will discuss it later in the body of this opinion. We will, however, address the error in the trial court minutes at this juncture.

---

[4] The Louisiana Appellate Project was appointed as appellate counsel.

[5] On April 4, 2022, this court granted Defendant's request for a copy of the record and granted him until April 21, 2022, to submit a pro se brief. The delay for Defendant to file his pro se brief has long passed and no pro se filing has been received.

As shown on the written responsive verdict form and the transcript of the jury's verdict, the jury found Defendant guilty of attempted armed robbery of Southern Classic and Mrs. Smith. However, according to the court minutes, it is erroneously recorded that the jury found Defendant "GUILTY OF ARMED ROBBERY OF SOUTHERN CLASSIC CHICKEN RESTAURANT AND SHYLONDA SMITH;" instead, the court minutes should have shown the jury's verdict as having found Defendant guilty of attempted armed robbery of these two victims. In addition, although the court minutes indicate the jury was polled regarding its verdict as to Paul Smith, Sr., the minutes do not indicate the jury's verdict regarding that conviction. Therefore, we instruct the trial court to amend the minutes of October 14, 2020, to correctly reflect the jury's verdicts regarding both counts as they are set forth in the trial transcript and the written verdict forms.

### SUFFICIENCY OF THE EVIDENCE

In appellate counsel's first and Defendant's sixth pro se assignment of error, it is contended there was insufficient evidence to support Defendant's convictions for armed robbery and attempted armed robbery. Specifically, appellate counsel asserts that the "evidence connecting [Defendant] to these offenses was essentially that he may have been with Gerald Jimmerson, the alleged co-defendant, and had phone contact with the co-defendant regarding the robbery." Likewise, Defendant's pro se filing contends that there was no evidence proving he participated in the robberies because no one identified him. For the following reasons, we find no merit to either argument.

As reflected in *State v. Kennerson*, 96-1518, p. 5 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367, 1371, the analysis for insufficient-evidence claims is well settled:

> When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the

7

evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, *rehearing denied*, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979); *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La.1981). It is the role of the fact finder to weigh the respective credibility of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the triers of fact beyond the sufficiency evaluations under the *Jackson* standard of review. *See State ex rel. Graffagnino*, 436 So.2d 559 (*citing State v. Richardson*, 425 So.2d 1228 (La.1983)). In order for this Court to affirm a conviction, however, the record must reflect that the state has satisfied its burden of proving the elements of the crime beyond a reasonable doubt.

In *State v. McGinnis*, 07-1419, p. 11 (La.App. 3 Cir. 4/30/08), 981 So.2d 881, 890

(quoting *State v. Ellis*, 42,520, pp. 4-5 (La.App. 2 Cir. 9/26/07), 966 So.2d 139, 144,

*writ denied*, 07-2190 (La. 4/4/08) 978 So.2d 325), this court stated:

> To convict a defendant of armed robbery, the state is required to prove: (1) a taking (2) of anything of value (3) from a person or in the immediate control of another (4) by the use of force or intimidation (5) while armed with a dangerous weapon. La. R.S. 14:64; *State v. Jeselink*, 35, 189, (La.App.2d Cir.11/2/01), 799 So.2d 684.

Regarding Defendant's conviction for attempted armed robbery, the supreme

court has previously stated in *State v. Ordodi*, 06-207, pp. 10-11 (La. 11/29/06), 946

So.2d 654, 660:

> In order to prove that Ordodi was guilty of attempted armed robbery, the state had to prove the elements set forth in La. R.S. 14:64 and La. R.S. 14:27, which provide in pertinent part:
>
> **§ 27. Attempt**
>
> A. Any person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object is guilty of an attempt to commit the offense intended; and it shall be immaterial whether, under the circumstances, he would have actually accomplished his purpose.
>
> B. (1) Mere preparation to commit a crime shall not be sufficient to constitute an attempt; but lying in wait with a dangerous weapon with the intent to commit a crime, or

searching for the intended victim with a dangerous weapon with the intent to commit a crime shall be sufficient to constitute an attempt to commit the offense intended.

### § 64. Armed robbery

A. Armed robbery is the taking of anything of value belonging to another from the person of another or that is in the immediate control of another, by use of force or intimidation, while armed with a dangerous weapon.

Our review of the record shows the State presented witness testimony as well as video evidence. That evidence is summarized below.

The State's first witness was Mr. Smith who testified that on May 1, 2016, he was at Southern Classic because his wife, Mrs. Smith, was the manager of the restaurant. Mr. Smith stated that he and his two children, both under the age of ten, were in the parking lot waiting for Mrs. Smith to get off work. According to Mr. Smith, one of his children mentioned a "man with the mask on" right before two individuals opened his door and yelled at him to turn off the light. Mr. Smith testified both men had masks on, were wearing black and blue clothing, and were carrying firearms which they pointed at Mr. Smith and his children. Mr. Smith stated the individuals took his keys and his cellphone.

According to Mr. Smith, the individuals waited beside his car after they got his keys and cellphone until someone opened the door to the restaurant, at which time they ran into the restaurant. Mr. Smith and his children jumped out of the car, ran to a nearby Checkers and called 9-1-1; at this point, he was informed that officers were already on the way. Hearing a gunshot, Mr. Smith left his children at Checkers and ran back toward Southern Classic. He then saw the two individuals who had confronted him run out the side door of the restaurant. He also saw the newly arrived

9

police officer in hot pursuit. Mr. Smith noted that he was unable to identify either of the individuals who robbed him with any more particularity.

Mr. Michael Allen Bodenhamer ("Mr. Bodenhamer"), a technician for Brown's Security and Life Safety Systems, also testified. Mr. Bodenhamer stated that he installed a security system at Southern Classic in 2016. According to Mr. Bodenhamer, he received a work order on May 2, 2016, to pull footage from the surveillance system, which he copied to a thumb drive and provided to the Natchitoches Police Department. The State then introduced sixteen videos into evidence which were pulled from different surveillance cameras at Southern Classic. These videos were then published for the jury to view.

Mr. Chester Bradford ("Mr. Bradford"), a cook employed at Southern Classic for over twenty years, also testified. On the night of the robbery, Mr. Bradford was checking to make sure the doors were locked, and the stoves were turned off as the restaurant was closing for the day. According to Mr. Bradford, he locked the front door and was returning to the back of the restaurant when he heard a whistle and a man with a pistol ordered him to lay down on the floor. Mr. Bradford testified he was joined shortly thereafter by two of his coworkers who were being watched by one perpetrator while the other was in the back of the restaurant with Mrs. Smith, the manager, and the cashier. He stated the individual watching him yelled that he was leaving when the second individual started leaving and there was a gunshot. According to Mr. Bradford, both individuals left at that point, although he subsequently heard "another shot in the front of the build[ing] and then they w[ere] gone."

Mr. Bradford recalled the individuals were wearing hoodies and masks, stating he believed one was wearing grey and the other black. He did not recall that

10

the individuals were wearing gloves, although he admitted he "wasn't really looking that close." He noted on cross-examination that he was unaware of anything being taken from anyone inside the restaurant as they did not keep cash in the building, and the employees were not able to open the safe.

Mrs. Smith was the next to testify. Mrs. Smith stated that although she had left Southern Classic about two years prior to trial, she worked there for roughly thirteen years and that she was a manager at the time of the robbery in May of 2016. Mrs. Smith testified that when one of the girls working at the restaurant exited the door, two men with guns ran inside, tried to force her to open the safe, and were "trying to rob" the employees at gunpoint. According to Mrs. Smith, both men had masks, black hoodies, blue gloves, and were carrying guns. Mrs. Smith further testified that the two men threatened to kill her if she did not open the safe. However, she stated that the men were unable to get any money out of the safe because it jammed. She noted one individual told the other they needed to leave because the police were coming. Mrs. Smith also stated the two men shot one of the doors in order to get out of the restaurant. Mrs. Smith then identified herself in one of the surveillance videos that the State previously introduced. She acknowledged the robbers got no money from the restaurant.

The State then called Ms. Marilyn Nash ("Ms. Nash") who testified that she was working at Southern Classic as a cashier and doing kitchen duties on May 1, 2016; she stated she had worked at the restaurant about nine years. Ms. Nash testified that after she finished her closing duties, she clocked out and was waiting for the rest of the employees to finish when two guys came into the restaurant with guns. At that point, she "took off through the back door and braced the door" before

11

calling 9-1-1.  She described the individuals as wearing all black, including black masks; she did not recall them wearing gloves but did recall they both had guns.

Corporal Guin testified that although he now works for the Red River Parish Sheriff's Office, he worked at the Natchitoches City Police Department for about six-and-a-half years, including May 1, 2016.  Corporal Guin stated that he had just turned onto Texas Street when a call came in regarding a robbery-in-progress at Southern Classic on Texas Street.  Unaware of the extent of the situation, he parked his unit at the driveway of the house next to the restaurant so that it would be out of sight.  According to Corporal Guin, he observed two men come around the corner of the fence near the restaurant; they were wearing dark-colored hoodies, and this occurred less than a minute after the robbery was reported.  He testified that he jumped out of his unit and chased after the individuals on foot.  Referencing an enlarged map of the area, Corporal Guin then traced his path following the individuals through numerous backyards and over multiple fences:

> Okay, so, again they come around this fence right here and they ran through this driveway.  And there is a fence at the back of this property, there was a hole in it.  They went through that hole and I followed them through that hole.  They ran this way and there was actually a gentleman standing outside, I never identified him, never saw him again.  I kind of saw them making the corner and he said they went that way.  So, I turned and followed them down this street.  I'm sorry I've got to look at it.  It's kind of upside down.  And then they turned into this field and ran down this line.  So, this whole yard is fenced.  I saw them hop over this fence.  At that time, I lost sight of them.  I was trying to see where they came out.  Then I saw them jump this fence into these bushes.  At that time, I waited, I found a tree, got cover.  I didn't want to go in the bushes because as far as I knew they were armed.  At least I believed they were.  When I heard them, I heard, I could hear them going over the fence through the bushes and going over the fence.  So, after they did that, I could hear, it sounded to me like metal and stuff on the other side.  I went into the bushes, there was a large like a 7-foot wood fence there.  So, I jumped over this fence that they came over initially and then I came over this back fence.  At that time Mr. Hardy ran from behind the shed running across the yard.  It's hard for me to tell, I was running, but I believe that there is an actual

12

trailer right there now, or was. I believe he ran in between that trailer and that house and he, I apprehended him right there.

Corporal Guin further noted that he got behind Defendant as Defendant ran past the shed, yelled at Defendant to freeze, then chased him around the corner of the building where Defendant finally complied with his instructions to stop and put his hands up. Corporal Guin noted that Defendant was carrying a phone and a wallet; he also noted a picture of a girl came up on the phone which matched a picture in the wallet. According to Corporal Guin, Defendant was wearing "[d]ark colored sweat clothing" when he was arrested, and also noted that Defendant "had a piece of blue glove on his hand." Corporal Guin testified that when he arrived at the Natchitoches Police Department, Defendant was informed of his *Miranda* rights, and voluntarily waived those rights.

Corporal Guin stated that he then returned to Southern Classic, and he retraced the path of his chase of Defendant to recover additional evidence. While retracing his steps, Corporal Guin recovered two blue gloves along the route as well as a blue LG flip phone at the location where he arrested Defendant. Corporal Guin noted the wallet he recovered from Defendant at the time of the arrest had approximately one thousand dollars in it, all in twenty-dollar bills. He stated he was unaware of whether there was any proof regarding the origin of the cash.

Lieutenant Victor Pinkney ("Lieutenant Pinkney") of the Natchitoches Police Department was the next to testify. Although Lieutenant Pinkney now oversees shift patrol, he noted that he was an investigator in the Natchitoches Police Department's high-tech crime unit at the time of the robbery on May 1, 2016. He noted that, as part of his training for the high-tech crime unit, he was trained in cellphone analysis. Lieutenant Pinkney testified that upon his arrival at Southern Classic, he was presented with two phones: a Samsung Galaxy smartphone which belonged to

13

Defendant and the flip phone which was believed to belong to a Mr. Gerald Jimmerson. He testified he placed the phones in airplane mode to prevent tampering and then placed them in a "chamber" where they could not receive a signal until he could obtain forensic search warrants.

Lieutenant Pinkney's testimony was that he procured both a physical search warrant for Defendant's phone and a search warrant for the call detail records (CDRs) from AT&T. Lieutenant Pinkney noted that because AT&T's CDRs use "precession location" one is able to determine the actual location of the cellphone, not just which tower it used to transmit. Although Lieutenant Pinkney testified that he did some cellphone analysis within days of the robbery, he stated he was not able to use the CDRs to pinpoint the phone's location until 2018 when enhanced technology was available. According to Lieutenant Pinkney, his analysis identified the owners of the phones, established communications between the phones going back months before the robbery, and proved that both phones were at Southern Classic at the time of the robbery. Specifically, Lieutenant Pinkney noted:

> I was able to map through precision location from AT&T that they were behind Southern Classic at minutes before the crime took place. I mapped them coming out of Southern Classic while the crime was going on. And I mapped part of the pursuit after the crime was committed. I was able to map part of that. And after that of course we got possession of the phone.

Lieutenant Pinkney acknowledged that he was not able to do a pinpoint location of the cellphones inside Southern Classic, which he blamed on signal distribution from the building because it contained a large amount of tin. However, he testified that he did map the phones right outside the doors of the restaurant at times consistent with the entry and exit of the robbers. Lieutenant Pinkney also testified that through his basic phone analysis he was able to establish communication between the two

14

phones, including multimedia messages (MMS) referencing firearms "similar to the weapons that are on surveillance."

Lieutenant Pinkney testified that when he left the crime scene, he went to the Natchitoches Police Department to speak with Defendant. At that time, he was informed by Corporal Guin that Defendant had been transported to the hospital, had signed a waiver of rights form, and that he wanted to speak with Lieutenant Pinkney. According to Lieutenant Pinkney, he went to Defendant's hospital room and asked if Mr. Jimmerson had been with him. At that time, Defendant confirmed Mr. Jimmerson's presence before stating that he was hurting and in pain, at which time Lieutenant Pinkney asked no further questions. Lieutenant Pinkney testified three .380 shell casings were recovered at the restaurant but that they did not contain DNA evidence; he also confirmed no fingerprints or DNA evidence was recovered from the restaurant, noting, however, that "surveillance clearly showed that they were wearing gloves and covered up." He confirmed that no money was reported stolen from the restaurant, and no one was able to identify the robbers. On cross-examination Lieutenant Pinkney acknowledged that he could not say that either cellphone had been inside Southern Classic but noted he could say they were right outside the side door.

Defendant chose not to testify at trial or present a case-in-chief.

Against that factual backdrop, we note that both appellate counsel and Defendant attack only the lack of evidence regarding whether Defendant was a participant in the robberies and raise no claims regarding the other elements of the offenses. While it is true that no one ever picked Defendant out of a line-up and Mr. Jimmerson did not testify, there is still evidence that Defendant was one of the individuals who committed the robbery. Mr. Smith testified that two men robbed

15

him in the Southern Classic parking lot before entering the side door of the restaurant when an employee exited the restaurant door. After watching video number three of the sixteen surveillance videos entered into evidence as State's Exhibit 1, we find the video evidence corroborates Mr. Smith's testimony as it shows one employee of the restaurant walk through the door while another employee attempts to close the door behind her. At that point, the two men rush the door, pointing guns at both employees while the one employee, who was already outside, takes off running. Mr. Smith also testified he saw the same men come out of the restaurant at the same time Corporal Guin arrived and immediately saw Corporal Guin as he began chasing them.

The surveillance videos clearly show both men wearing gloves and carrying firearms inside the building, one of the individuals firing his weapon toward the front door multiple times, and both men running from the restaurant toward Texas Street. Although the majority of Corporal Guin's body camera footage is so dark it is nearly impossible to tell what is going on, other than Corporal Guin's occasional comments on the radio, it shows that he pulled up to the scene, jumped out of his car, and immediately began pursuing the two men who exited Southern Classic on foot. While it is clear from the video that Corporal Guin lost sight of the suspects at least twice, he testified that he was following the sounds of the two individuals as they jumped fences and ran through numerous yards. Furthermore, when he apprehended Defendant, Defendant's right hand had the torn remains of a blue latex glove on it.

Finally, we note that Lieutenant Pinkney's testimony established he was able to trace Defendant's cellphone immediately outside the restaurant at the beginning and end of the robbery, as well as along the route Corporal Guin chased the suspects. Considering the above and after viewing the evidence in the light most favorable to

16

the prosecution, a rational juror could have found the State proved beyond a reasonable doubt that Defendant was one of the individuals who robbed Mr. Smith and attempted to rob Southern Classic and Mrs. Smith. Therefore, we find no merit to the assignments of error that there was insufficient evidence to convict Defendant.

## TRIAL DURING COVID-19

In the second assignment of error brought by appellate counsel, Defendant contends the trial court erred in proceeding to trial during the COVID-19 pandemic, claiming it was a violation of his constitutional rights to due process, effective assistance of counsel, right of confrontation, and right to be tried by a fair cross-section of the community. Counsel cites the fact that the Western District of Louisiana postponed jury trials until January 4, 2021, whereas Defendant's trial occurred in October of 2020. Counsel also argues that trial counsel could not be effective due to an inability to see the juror's faces, concerns over safety, the possibility of someone's mask making it difficult to understand them, and an inability to communicate with Defendant due to social distancing. Finally, appellate counsel contends the jury could not properly assess the credibility of witnesses because of face masks and that Defendant's presumption of innocence may have been affected because Defendant was wearing a mask and so was the perpetrator of the robberies.

Initially, we observe that although trial counsel filed multiple motions for continuance of trial due to the pandemic,[6] Defendant was simultaneously filing pro se motions for speedy trial, professing his desire to go to trial, and criticizing the lengthy delays in his case which saw him arrested in May of 2016 and that he remained in jail until his October 2020 trial. Notably, trial counsel's motion for a

---

[6] On October 12, 2020, Defendant also objected to the trial going forward after the most recent hurricane.

continuance was filed on September 29, 2020, despite Defendant filing a pro se motion for speedy trial on September 2, 2020. In Defendant's motion, he noted he had been incarcerated for over fifty-two months and argued it was the trial court's "duty to grant the requested trial." He also argued that his motion should be granted because he had already filed a motion to act as co-counsel, so his signature should be sufficient to prove he was ready for trial. Defendant's motion was denied solely because his trial was already scheduled for October 12, 2020.

Defendant filed repeated motions for speedy trial and multiple writs of habeas corpus seeking either his release or his trial, including a motion for speedy trial less than a month before trial counsel requested the continuance at issue. Despite appellate counsel's claims that trial compromised Defendant's rights, the trial court gave Defendant exactly what he had repeatedly requested, his day in court. Furthermore, the record shows the trial court utilized various methods to assure the safety of individuals in the courtroom[7] while still affording due process in the adjudication of Defendant's guilt or innocence. We note yet further that appellate counsel's arguments are based almost entirely on the existence of hypothetical issues which she cannot prove existed. Therefore, we find, based upon the record now before us, that this assignment of error lacks merit.

### DEFENDANT'S REMAINING
### PRO SE ASSIGNMENTS OF ERROR

As previously noted, Defendant filed a writ application in docket number 21-105 which was consolidated with his current appeal. In that writ application, Defendant asserted there was insufficient evidence to support his conviction in his final assignment of error. We have considered that assignment and have rejected it.

---

[7] One such precaution was to move the trial from the traditional courtroom to the Natchitoches Events Center to better provide for social distancing.

Nevertheless, Defendant's first five pro se assignments of error all focused on the trial court's denial of his motion to suppress all evidence and statements obtained following his arrest. Those assignments of error are (1) the trial court erred in not reviewing the entirety of Corporal Guin's body-camera footage, (2) the trial court erred in finding probable cause to arrest Defendant, (3) the trial court erred in admitting statements and evidence obtained by Corporal Guin, (4) the trial court erred in allowing Lieutenant Pinkney to present hearsay evidence of a conversation with Defendant at the Natchitoches Regional Medical Center, and (5) the trial court erred in not suppressing all evidence and statements obtained in violation of Defendant's *Miranda* rights. Because these five claims are interrelated and address the trial court's denial of Defendant's motion to suppress, we will address them together. In short, Defendant makes two contentions that are contained in five assignments of error, namely: that Corporal Guin's initial arrest of Defendant was illegal and that his *Miranda* rights were violated when Corporal Guin searched him and "interrogated" him after his arrest.[8]

Defendant's pro se motion to suppress was filed on October 17, 2019, and it did not set forth what Defendant was seeking to have suppressed. When the State raised this issue during a hearing on January 28, 2020, the trial court ordered Defendant to decide if he wanted to represent himself at trial or if he wished to be represented by trial counsel; furthermore, the trial court ordered Defendant and trial

---

[8] Initially, it appears that in Defendant's pro se argument he confuses probable cause to arrest someone with probable cause to charge someone with a crime. Although Defendant complains about the trial court not viewing Corporal Guin's body camera footage during his preliminary examination, he simultaneously contends there was no probable cause to arrest him. "The primary function of the preliminary examination is to determine if there is probable cause to believe a defendant has committed a crime in order to hold him on his bond obligation for trial." *State v. Baham*, 13-901, p. 3 (La. 6/28/13), 117 So.3d 505, 507. Furthermore, this court has previously held that "[t]he determination of probable cause in a preliminary examination is laid to rest after trial and conviction." *State v. Mayberry*, 457 So.2d 880, 882 (La.App. 3 Cir.), *writ denied*, 462 So.2d 191 (La.1984).

counsel to either file a motion for Defendant to represent himself or to file a more specific motion to suppress. Despite the trial court order to do so, no revised motion was ever filed. Nevertheless, the record shows trial counsel informed the State of what Defendant wanted suppressed and the State agreed to hear the motion to suppress together with the State's motion to admit the statement made by Defendant to Lieutenant Pinkney. The motion to suppress was heard on July 7, 2020.

Before addressing Defendant's argument, we are reminded of what this court stated in *State v. Bargeman*, 98-617, p. 5 (La.App. 3 Cir. 10/28/98), 721 So.2d 964, 967, *writ denied*, 99-33 (La. 5/28/99), 743 So.2d 658, to wit:

> When a trial court rules on a defendant's motion to suppress, the appellate court must look at the totality of the evidence presented at the hearing on the motion to suppress. The appellate court should not overturn a trial court's ruling, unless the trial court's conclusions are not supported by the evidence, or there exists an internal inconsistency in the testimony of the witnesses, or there was a palpable or obvious abuse of discretion.

Defendant's argument that he was illegally arrested, searched, and interrogated is put forth in his own words:

> Petitioner asserts that arresting officer having no description of the alleged assumed suspects he's giving chase after and then calling in on dispatcher losing sight of these suspects for over three minutes, then just encountering an individual putting him in handcuffs, interrogating, and searching him without informing him he's detained or under arrest, unreasonably searched and seized him in violation of his 4th Amendment Right of the U.S. Constitution; and his Louisiana Constitution of 1974 decleration [sic] Right Act. 1, Section 5 and 13, on scene.

At the hearing on July 7, 2020, the trial court heard testimony from Corporal Guin and Lieutenant Pinkney. Corporal Guin testified like his trial testimony, noting that he pulled up to the house next to Southern Classic and immediately jumped out of his car and gave chase to two individuals who came around the fence from the restaurant and immediately ran away from him. Corporal Guin stated he chased Defendant and another individual through multiple backyards, going over fences and

20

through bushes before apprehending Defendant. At the time he detained Defendant, Corporal Guin noted Defendant had a phone in his pocket and a wallet on him, noting he procured the phone when it rang. Corporal Guin testified that after initially detaining Defendant, he transported Defendant to the police department; at that time Corporal Guin read Defendant his *Miranda* rights and Defendant signed a waiver of rights form.

Lieutenant Pinkney then testified that, prior to his first personal interaction with Defendant, he obtained the signed waiver of rights form Defendant had signed with Corporal Guin. He then met Defendant at the hospital and asked Defendant if Gerald Jimmerson ("Jimmerson") was with Defendant "at the time of the incident" and Defendant replied that Jimmerson had been present. Lieutenant Pinkney testified he did not ask Defendant any other questions at the time. Lieutenant Pinkney acknowledged that an interview would normally have happened in a recorded interview room but noted Defendant "was in the hospital not about to be released and it was urgent information pertaining to a suspect on the loose with the gun or considered armed and dangerous."

Contrary to what was proven by the body camera footage viewed by the jury during trial, Corporal Guin initially testified that he did not answer Defendant's phone or speak to anyone on it, that Defendant had not made any statements to him at the time of his arrest, and that he did not ask him any questions at the time he apprehended him. Defense counsel partially impeached Corporal Guin's testimony with a portion of the body camera footage.[9] In that regard, we take note of the conversation that occurred between Corporal Guin and Defendant upon his apprehension. When asked if his partner had his gun, Defendant told Corporal Guin,

---

[9] Defense counsel opted not to play the entire video even though all was available.

21

"It was him who had a gun." Corporal Guin then asked for the other man's name, to which Defendant replied "[y]ou not gonna let me go, so fuck you."

At the suppression hearing, we find the record shows trial counsel's argument presented only unsupported claims that Defendant "may have very well reasserted his *Miranda* rights and his sixth amendment rights," and an argument that Corporal Guin's testimony lacked credibility. Furthermore, trial counsel appeared to seek suppression of nothing more than the single answer given to Lieutenant Pinkney at the hospital. Because Defendant's pro se motion to suppress was adopted by counsel without any amendment, there is nothing in the record to indicate Defendant sought suppression of the statements he made at the time he was arrested, or any evidence related to the location of the phone found on his body when he was arrested. Additionally, the record shows that the written order finding Defendant's statement to Lieutenant Pinkney was admissible did not refer to any other evidence.

Under La.Code Crim.P. art. 703(F):

A ruling prior to trial on the merits, upon a motion to suppress, is binding at the trial. Failure to file a motion to suppress evidence in accordance with this Article prevents the defendant from objecting to its admissibility at the trial on the merits on a ground assertable by a motion to suppress.

Ultimately, we find there is no evidence to suggest Defendant's statement to Lieutenant Pinkney was not voluntarily made. Despite Defendant's contrary contention, his signature on a waiver of rights form shortly before Lieutenant Pinkney spoke with him evidences otherwise. Furthermore, Defendant waived his right to contest the admissibility of any other evidence when he failed to file a motion to suppress which validly set out what evidence he sought to have suppressed and upon what grounds he felt it should be suppressed. As such, assignments of error one through five of Defendant's writ application in docket number 21-105 lack merit and are hereby denied.

22

**SENTENCING**

Defendant's third, fourth, and fifth counseled assignments of error all relate to Defendant's sentences, namely that the sentences are excessive, that the trial court failed to offer justification for its imposition of consecutive sentences for two crimes which were part of the same scheme or plan, and the trial court erred in applying the five-year firearm enhancement where the State did not charge him with a violation of La.R.S. 14:64.3.

In support of the trial court's utilization of La.R.S. 14:64.3, the State argues that *State v. Daniels*, 03-1621 (La.App. 3 Cir. 5/12/04), 873 So.2d 822, *writ denied*, 04-1802 (La. 11/24/04), 888 So.2d 227, allows the trial court to impose a firearm sentencing enhancement without prior notice to Defendant that the enhancement would be at issue.

We have reviewed *Daniels* and observe a key difference between it and the case at bar. In particular, the facts show that the defendant in *Daniels* was charged with violating both La.R.S. 14:64 and 14:64.3. In *Daniels*, 873 So.2d at 829-30, this court specifically noted:

> In the case at bar, La.R.S. 14:64.3 was listed in the bill of information, the jury was instructed that a firearm was used as a dangerous weapon, and the only weapon mentioned at trial was a firearm. Based on the jury instructions in the case at bar, the jury's verdict of "guilty as charged," and the fifth circuit's ruling in [*State v.*] *Walker*, [01-51 (La.App. 5 Cir. 5/30/01), 789 So.2d 86, *writ denied*, 01-1922 (La. 5/10/02), 815 So.2d 834,] we find that the jury could have reasonably inferred that the dangerous weapon used in the armed robbery at issue was a firearm. Accordingly, we find that the jury was not required to render a separate verdict under La.R.S. 14:64.3 and the jury was properly instructed regarding the Defendant's use of a firearm.

In addition to the fact the defendant in *Daniels* was charged with violating La.R.S. 14:64.3, the fifth circuit's ruling in *State v. Walker*, 01-51 (La.App. 5 Cir. 5/30/01), 789 So.2d 86, *writ denied*, 01-1922 (La. 5/10/02), 815 So.2d 834, the case

relied upon in *Daniels*, was based, at least in part, on the fact the State noticed its intent to seek an enhanced sentence prior to trial. The State in the present case neither charged Defendant with violating La.R.S. 14:64.3 nor filed a notice of intent to seek enhancement. Accordingly, we find *Daniels* is distinguishable.

This court has previously noted that to invoke the provisions of La.R.S. 14:64.3, the statute must be charged in the bill of information or indictment. *Daniels*, 873 So.2d 822.

As noted above, the only time enhancement of the armed robbery sentences was mentioned was during Defendant's post-verdict motion hearing; at that time the trial court, not the State, invoked this sentencing enhancement for the very first time. Because the trial court cannot trigger enhancement on its own, we find that the trial court lacked authority to impose the enhanced sentence. *See State v. Willis*, 45,857 (La.App. 2 Cir. 12/15/10), 56 So.3d 362, *writ denied*, 11-150 (La. 6/17/11), 63 So.3d 1034; *State v. Ramsdell*, 09-1510 (La.App. 3 Cir. 10/6/10), 47 So.3d 78. We will now address whether we should remove the five-year enhancements imposed by the trial court or vacate the sentences in their entirety.

Although the *Ramsdell* court simply removed the enhancement and otherwise affirmed the defendant's sentence, we find the present case requires remand for resentencing. In *Ramsdell*, the trial court imposed the maximum sentence for armed robbery, ninety-nine years, then added the enhancement, thus rendering the defendant's sentence illegal. In the present case, Defendant's sentences of ninety-five years for armed robbery and forty-five years for attempted armed robbery, even with the trial court's enhancement, are both within the legal range of sentences for his offenses. As such, this court will not assume the trial court will simply remove the additional five years. In recognizing this fact, we note that the trial court has

24

wide discretion in sentencing and may ultimately decide to sentence Defendant to the same sentences he currently faces, only without invoking the firearm enhancement statute. Accordingly, we vacate Defendant's sentences and remand for resentencing without application of the firearm enhancement of La.R.S. 14:64.3.[10]

## DISPOSITION

Defendant's convictions are affirmed. Defendant's sentences are vacated and set aside, and this matter is remanded to the trial court for resentencing. Additionally, we instruct the trial court to amend the minutes of October 14, 2020, to correctly reflect the jury's verdicts regarding both counts as they are set forth in the trial transcript and the written verdict forms.

**CONVICTIONS AFFIRMED. SENTENCES VACATED. REMANDED TO THE TRIAL COURT FOR RESENTENCING AND CORRECTION OF THE COURT MINUTES.**

---

[10] Because we find that Defendant's sentences should be vacated and remanded for resentencing, his third and fourth assignments of error are rendered moot.